Good morning. If it may please the court, I'm Amitai Schwartz, representing Dennis Cyrus, Jr. This is a big case. There are a lot of issues. It was a long trial. I tried to distill the case down into what I felt was our strongest issues. And for purposes of the argument this morning, I'd like to reserve five minutes for rebuttal. But the issues I chose to address were the gang expert issue, the crime lab, the reliability of the crime lab, the hearsay issues regarding the witness, Daryl McWilliam, and then talk, obviously, about prejudice. If the court – I want to address what the court's concerned about. So if the court has any other topic that they would like me to address, I'm both prepared to do that, and I'm willing to scuttle my prepared argument for that. Well, you know, the Ninth Circuit practice is we don't talk to each other before. We prepare independently. At some point in your time – and I've stood where you are standing now, so I respect that – I'd like to hear about the witness and the vicar. You know, the killing of the – is it Atkinson was the attempted murder? That's correct. Jimmerson was the victim. So no question that, in my mind, but that there was a killing or an attempted killing in one and a killing in the other. The question is, do they meet the requirements of the statute? And you argue that any way you want. Okay. Let me start with the gang expert issue. This is an issue that courts, appellate courts, have been struggling with for some time, which is the extent to which a police officer who is both an active officer with respect to the investigation can testify both in his capacity as an expert and whether he has the mantle of expertise that we expect under Daubert and Kumho tires. The problem with Officer Pegler was that he was – and there were abundant objections to his testimony, so I think there's no question that the review is – whether there was an abuse of discretion. First, whether he was really qualified to talk about what he was – what he talked about. And second, whether he went beyond the scope of appropriate expert testimony. The qualifications, I think, were fully briefed, so I'm going to skip over that, but I'm not abandoning it or waiving it. The question is whether the breadth of his testimony, where he opines as if he's a cultural anthropologist, sociologist, about the philosophy, the principles of gangs. This is a pretty sophisticated subject in some respects, in that there's scholarly research on this, that we try to figure out why gangs operate the way they do and so forth. But as to the topics that he was testifying about, they were pretty simple. And so the question is, you know, there's revenge, reputation, turf, code of silence, and so forth. So the question is, what did – why did the district court allow him to testify to that extent, and whether it was an abuse of discretion to do so. We pointed out in the brief that basically what he was doing through the hypothetical questions was he was really giving what would normally count as summation, which is, at the end of the case, the assistant U.S. attorney stands up and he says, here's what I think the evidence presents. The judge instructs the jurors, what the attorneys say is not evidence. So it's their interpretation, you should listen to them, but it's not evidence. But when Pegler testified, it was evidence. And the jurors instructed that they are supposed to consider his testimony the same way they consider the testimony of percipient witnesses, and give it the same weight. And was it really necessary, and more importantly, was it lawful for him to opine through these hypothetical questions about matters that were either obvious or had been said by other witnesses in the case, such as Lacey Jackson and Donald Armour? Counsel, to the extent that the testimony was simple, as you described it, or obvious, was there any prejudice to him doing so? Yes. There was enormous prejudice. Why? If these were self-evident observations he was making, then what was the prejudice? Well, because he, as the prosecutor said in closing argument, he said, you don't have to take Lacey Jackson's word for it. You don't have to take Donald Armour's word for it. And those were these principles. You heard it from an expert. It's the real deal. So your position is that the designation of the expert testimony, that mantle, was prejudicial to your client? Absolutely. Because, I mean, Armour and Jackson were these convicted criminals with long, long records, which were brought out of trial. They were getting benefits. They had a deal going. The government spent over an excess of, I think it was said, hundreds of thousands of dollars on Jackson alone. They were accomplices. You know, they were shaky witnesses to frame an entire case on. And in that respect, by putting Pegler up there, the, quote, real deal, you cloak him in this mantle, or as the Court said in the Mukhtar case, he exudes the mantle of expertise, which is wrapped around the concepts that he's talking about. Can you identify specific sentences, specific statements he gave in the course of his testimony that you think were prejudicial to your client? Well, I would say everything he said. I'm not going to single any specific sentences. I think his entire testimony was prejudicial. With the exception of whatever testimony he gave about gang symbols and modus operandi. I mean, the Court has made it plain that that's proper. But all his, what I will point to is all his testimony regarding protection of reputation, revenge. The principles, the four principles that he laid out, I think were extremely prejudicial. The other issue is that, as the Court recognized in Mukhtar, you know, an expert has far more latitude to opine on these sorts of things. He can rely on other evidence informing his opinion that a lay witness can't bring to the table. And so in a sense, I mean, we're saying it was prejudicial because it was unfairly I think it was prejudicial. Everything on the other side is prejudicial. Did you try the case? Did I try it? No, I did not. Did the defense counsel who did try it have access to information about prior cases in which Pegler had testified? I would think so. If you don't know, I don't know. I don't know, but I think the discovery was there was no complaint about not having access. But there was a proffer of what Pegler was going to testify about, and the defense challenged that proffer in a motion in limine, which is in the . . . Who did try it below? Who tried it for the defense below? James Thompson and John Phillipsborn. Counsel, I would like to ask you about I think the same thing that Judge Hawkins was pointing you to, and that is evidence of the connection of the killing, an attempted killing, to the motivation to silence a witness in a federal proceeding. So would you turn to that issue and tell us why you think there was insufficient evidence of that connection? Okay. With regard to the Jimmerson killing, he was the government informant who had previously testified before a federal grand jury. We challenged it under two grounds. One, that there was insufficient evidence to show that Mr. Cyrus acted to prevent future testimony, whether there was sufficient evidence of prevention or acting to prevent. And then secondly, under the other statute, Section 13, whether there was sufficient evidence to show that he was retaliating or had shot him in retaliation for testifying in a federal proceeding. As to the first, the intention to prevent, it's our contention that it's pretty clear that the defendant shot Mr. Jimmerson. That's not the issue. The issue is why did he do it? And there is, now this is where we get to this interlinked hearsay problem with Mr. McQuillan. But assuming that Mr. McQuillan, and I'm not conceding this, I'm not abandoning it. Right, no, we don't consider anything abandoned that you have actually argued, unless you expressly abandon it. Assuming that for a moment that Mr. McQuillan's testimony was properly admitted, which it wasn't, all we know really is that Cyrus may have said to McQuillan and to some others that he shot Jimmerson because he was a snitch. So we have this word snitch, and that's the sum total of really what the evidence shows. According to the record, he said, was snitching, be snitching, or snitched, and snitched. That's at ER 486-1497. Yeah. Be snitching sounds active. Well, I'm not sure it is. I mean, there's a lot of slang in this. In fact, I had to use the Urban Dictionary to decipher some of it when I wrote the brief. But there's a lot of slang in here, and I'm not sure that that actually means what it says. What it means, and what I interpret it to mean, is Jimmerson was a snitch. So the question is, did he, so when he shot him, did he know, did he have any evidence, that is, did Mr. Cyrus have any evidence at all that he was going to testify again? Maybe he was done testifying. I mean, it's completely unclear. The only people who know that Cyrus, excuse me, that Jimmerson was slated to testify again before a grand jury, was the case agent, Mr. Gilhooly, and presumably the U.S. Attorney's Office. But that wasn't necessary, and there's no evidence that would lead to an inference that Cyrus knew that. Cyrus went after him, but he didn't Blaser testify about that. Excuse me? Blaser testified about that. He's another one that compromised. Blaser said that he was going to get him in another federal case, and he said that at the time that Blaser and Cyrus were in the county jail. Cyrus wasn't even federally indicted yet. So it wasn't clear why, and I pointed this out, why Cyrus would have known. There was no evidence to draw the inference that Cyrus would have known. But that testimony happened, and credibility of the testimony, Blaser's testimony was admissible. I mean, I don't think that's even one of your arguments, as I recall. Isn't the credibility of his testimony a jury question? Once that evidence is in, don't we have to look at the evidence in the light most favorable to the verdict? You do. And the testimony was in, but my contention is that it's a very thin read to that one little snippet, or there's two words, or three words, another federal case would be enough. In the context in which it was given, I mean, certainly the court owes deference to the jury. And there's certainly circumstantial evidence, too, that there's kind of an information underground, if you will, that people in the gang were very aware of what was going on and wanted to find out if people were snitching or about to be snitching, that that was important. And that was a topic of general conversation. So if that is kind of the context also, that kind of testimony would bolster it. Well, except that that's exactly what the court has said you don't count, which is rumors. I mean, rumors that, you know, people might be snitching. No, no, no. I think my concern is a little different than rumors. I think there is testimony that snitching is an important topic of conversation generally. So it lends credence to the specific statement, he's going to be a witness in another federal case. It's background music for that, I guess. Well, I don't think so. I mean, I think, as I said, the evidence was very tenuous as to another federal case and how in the world Cyrus would have known that. I mean, the only thing that . . . Is that an element? Do we have to know how he knew it if he did know it? No, no. We just go on the evidence that was produced at trial. And I'm contending that Blazer's testimony was not . . . Given Blazer's position, he just had an argument with Cyrus. It's clear he's got . . . There's a whole back and forth in the cross-examination about Blazer essentially trying to sell his testimony to the U.S. attorney and so forth. We're going to convict someone if those three words coming from his mouth are the sole piece of evidence available. I'd like to reserve five minutes. I think you may reserve your remaining four. You've used all but four, but you're welcome to reserve it. Four issues. No, no, no. Four minutes and one second. We'll hear from the government. May it please the Court, good morning. I'm Nina Goodman. I represent the United States. I'd like to first address the sufficiency of the evidence claim. Just to clarify one thing that might have come up in defense counsel's argument, the attempted murder of Mr. Atkinson was not charged as a witness murder. That was charged solely as a vicar. Yeah, that was vicar or vicar. Yes, it was, Your Honor. I understand that. Let me count nine and ten. Both involve Jemerson, correct? Yes, Your Honor, and count eight, which was the vicar or vicar count with respect to Jemerson. I'm focusing on witness. Yes, Your Honor. So counts nine and ten are the witness murder of Jemerson, correct? That's correct, Your Honor. The count ten is retaliation? Yes. Yes, sir. So if the evidence was sufficient to show that Cyrus knew that Jemerson had been a witness in the past, that would be sufficient for this count? That's correct, Your Honor. I want to clarify one thing about the record. In the district court . . . Before you do, before you do, count nine, on the other hand, would require that Cyrus knew that he was going to be a witness in the future, right? Or that his . . . Well, Your Honor, this is the statute. I would say no, or he doesn't have to know specifically. And the reason I'm . . . He doesn't have to know that he's going to testify in the United States v. Smith & Jones on October 31, 2013, but he has to have some knowledge that this is ongoing. He didn't just testify or cooperate once and stop. Well, Your Honor, in fact, that may not even be required that specifically. And the reason I'm basing my argument on the Supreme Court's recent decision in the Fowler case, which dealt specifically with this statute, 18 U.S.C. 1512, and what the court said in that case was that 1512 applies to a defendant who kills with intent to prevent communication with law enforcement officers generally. And so there is some future-looking component, but it's quite general, and the court said that would be sufficient as long as it is reasonably likely that, without the killing, a relevant communication will be made to a federal officer. And here there's no dispute on that. Jimmerson was an active federal cooperator, but the evidence that he acted to prevent this in the future consists of his own statements in which he said to his cousin, Daryl McQuillian, and this was in McQuillian's grand jury testimony. This has nothing to do with the videotaped evidence that is challenged in this court. This is in the grand jury testimony, the admission of which is unchallenged in this court. He said he had to give him two because he was snitching, was snitching. And that suggests, or be snitching, that was another way it was put. That suggests an ongoing, and what in fact was the case, course of cooperation. The issue that's primarily raised here on the sufficiency is Cyrus's knowledge that Jimmerson was snitching before the murder, and we submit that the evidence is simply overwhelming on that. From his own statements, from the testimony of Hudson, who was a member of the gang, that not only the whole Fillmore Western District knew that Jimmerson was a cooperator with the federal government. And so we believe that that evidence, viewed in the light most favorable to the government, certainly was sufficient for the jury to infer that this was a reason for his killing. And there were also obviously two other convictions on the Jimmerson murder. If the court has no other questions about that, I could turn briefly to the gang expert. Here the rule 702 requires that expert testimony be helpful to the jury, and here it was helpful to the jury. Even though cooperators talked about the importance of maintaining your reputation, the officer, based on his experience, based on his training, based on his participation in hundreds of gang investigations, testified and gave an objective, broader perspective than any single cooperating witness could. Did Pegler testify before or after the other witnesses? He testified towards the middle of the trial. I think he was after Jackson. I do not remember if he was before Armour, but there were also other witnesses who said the same thing, and there was no contrary testimony. On the issue of the use of hypotheticals. Well, you know, it's one thing to put on a witness that says Cyrus killed this guy to enhance his gang reputation and have that admitted, and then have a police officer get on the stand and say, this is the reason people in gangs kill people, is to enhance their reputation in the gang. So you're really using the expert witness to argue, in summary form, the government's position, aren't you? No, Your Honor. What this is is permissible expert testimony that this court and other courts have allowed that allows jurors, lay jurors who have no knowledge of what might be the principles under which criminal gangs operate. This type of testimony, which mentioned nothing about Cyrus, didn't use the word Cyrus, didn't use the name of anyone in the gang, is comparable, as the Second Circuit has said, to sociological testimony about principles underlying a gang. And this court has said that this is permissible expert testimony. But, Counsel, it really depends upon how you're using it. And if you're using it the way you've just explained in response to Judge Hawkins' question, then it seems to me that it becomes much more important that the witness have specific knowledge about a particular gang. Yes. And, in fact, Your Honor, the district court here said exactly that. After Officer Piegler testified about his qualifications, there was some discussion. The district court excused the jury and said to the government, this is relevant only if you can show exactly what Your Honor just said. And the counsel said, yes, we can show that. And then the trial resumed, and Officer Piegler testified that not only did he have this general knowledge, but he had specific knowledge of this gang and that its workings, its principles, were the same as others. And as this court recognized in the Banks case, where the issue was sufficiency of the evidence, but the court recognized that an officer's testimony about a gang's expectations of its members, the types of things that will cause you to lose respect, supports the jury's inference that that's why a particular defendant would commit a shooting to maintain his position. I think it's also important to note that the district court very carefully instructed the jury, not only during the officer's testimony, but in its final jury charge, that it should consider the expert testimony exactly like any other testimony. You may accept it or reject it. You should only give it as much weight as you give it whatever weight you think it deserves. So if the jury was specifically instructed, this is not some special type of evidence. But jurors always hear that instruction. And yet we know that we need to be very careful about designating someone as an expert witness. We know that's very powerful for the jury to hear that. Well, and that's why the instruction is there, Your Honor, I think, to remind them that this is just another witness. And here, this was brief testimony. It was limited specifically to areas such as the code of silence and these principles that gangs' expectations of its members, the type of acts that can cause members to lose respect, that this court specifically has referred to. And so even though the issue in Banks wasn't the gang expert, the court said that's a valid type of evidence from which the jury can infer. And if I could just add one more thing about the hypotheticals, the hypotheticals were not, there were no hypotheticals on the government's direct examination. It was just straightforward questioning. The hypotheticals using the facts of this case were introduced in the defense counsel's cross-examination where he specifically crafted lengthy hypotheticals. And the government responded without objection, I mean, without an additional objection, by asking very brief hypotheticals that just said, I mean, the defense counsel was suggesting that, well, some of these killings may be not wanted by the gang or they may not help the person in the gang. And the government responded, well, what about a killing where someone has refused to, has tried to take your drug customer, which is what happened in, you know, one of the murders? Counsel, before you leave this area, could you please give me quickly the citations to the transcript where this expert testified about his knowledge of this particular gang? I can, Your Honor, but I'll have to retrieve my brief. Can I do that, please? Thank you. I have that he testified he was very familiar with this area. If you just give me the. 1062 to 1065. This is in the defendant's excerpts of record. Excuse me. Thank you. I have 1062 to 1065, 1088, and 1093 to 1094 as his knowledge, his familiarity. I believe I've responded to the issues that were raised. I'll be extremely happy to answer any questions the Court has about anything about the case. I don't believe we do. Thank you. Thank you. And we'd ask that the judgment be affirmed. Thank you. Mr. Schwartz, you have four minutes and one second. With respect to Judge Hawkins' question about who testified first, Jackson or Pegler, the middle of the trial. That's why we presented this as he was a mid-trial summation. Because they used this expert to not only project this mantle of expertise, but to project what the government's case was with regard to the Vicar counts by trying to fit it into or draw the inferences that the jury is supposed to draw as to whether or not Cyrus had committed these various acts in order to promote himself within the gang and why he would have committed the acts that he committed. Couldn't the jury's common sense have led them to the same conclusion? I mean, you have this one murder because I guess he didn't get a referral fee for selling some crack or cocaine, excuse me, and he just kills the guy. And one of his cohorts says, well, it's really kind of stupid to do that. But he does it anyway. Wouldn't that lead the jury to believe that this was done to create an atmosphere of fear about him? Well, that would be a permissible inference, certainly. There are also many other inferences. And so in order to direct the jury's attention to the inference the government wants them to draw, they use the expert. But I think to the extent that you may be concerned about the prejudice or the unfair prejudice due to the fact that the jury could have come to this conclusion on its own, I don't think we should underestimate the power of having a police officer expert package all this together and present it as if it's science or sociology or anthropology. And that's where the unfair prejudice comes in. It's giving the government two cracks at summation instead of just one. And, you know, I hate to raise the slippery slope argument, but I will. But this case, if this gang expert is affirmed with respect to the scope of his testimony, I think the Court's going to go further than at least any other case I was able to find in the Ninth Circuit. Counsel, did the government correctly portray the sequence? Because I don't remember the answer to this. That's why I'm asking. That the hypothetical questions began with cross-examination and had not been used on direct by the government? That's correct. Does that make any difference? No, it doesn't. In fact, that was going to be my next point. It doesn't open the door to asking other hypothetical questions? Not really, because the questions that the defense attorney had, he had, you know, the district court had said it's proper for this gentleman to testify as an expert. So all that evidence was in about the four principles, the philosophy, and so forth. So then defense counsel on cross-examination asked to do something, so he figures he's going to use it. Well, not necessarily. I mean, sometimes the best cross-examination is no cross-examination. That's a choice. In the face of this testimony, I don't think defense counsel had much of a choice. But he asked him some very simple questions. Could a younger guy look up to an older guy? That wasn't something that, and he's referring to Lacey Jackson's relationship to Dennis Cyrus, that wasn't something that was brought out in the four principles. So that was, and he put that in the form of a hypothetical. So then the government on redirect turns around and uses a hypothetical in the context of each of the murders and says if somebody is killed because they wouldn't, I don't remember exactly, but if somebody wouldn't allow somebody to stash their guns and so forth or attempts to murder them for that reason, would that be consistent with one of these principles? And the answer is yes. And he takes them through each one, the Atkinson killing, the Hearns killing, the Mitchell killing, and the Jimerson killing. So it's... I was just going to say that your time has expired, but if you'd like to sum up briefly, you may. Well, I mean, that's basically my summation is that this, I just want to, I've said it, but it is a slippery slope because this issue was raised in Hermannick where, it was about 11 years ago, United States versus Hermannick, where an FBI agent testified as an expert with regard to drug transactions and went beyond just, you know, what does it mean or what do the words mean. And the court was very careful with the way, although it upheld that, it found that the testimony was harmless, it was very careful. Second Circuit's been struggling with this issue. This court struggled with this issue in the Freeman case. And if what the government did through Officer Pegler is upheld here, I think you're going to open up that floodgates. And I hate to make the argument, but I have to. You hate to make it, but you've now done it four times. Okay. Thank you. Thank you, counsel. The case just argued is submitted. We appreciate very much the arguments of both parties. They've been quite helpful.
judges: Hawkins, Graber, Christen